**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 3, 2018**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) **CRIMINAL NO. _____** |
| **Plaintiff,** | ) **VIOLATIONS:** |
| **v.** | ) **18 U.S.C. § 371**<br>) **(Conspiracy)** |
| **KO CHOL MAN,** | ) **50 U.S.C. § 1705**<br>) **(International Emergency Economic** |
| **KIM SONG UI,** | ) **Powers Act Violation)** |
| **HAN UNG,** | ) **31 C.F.R. 544.201 and 544.205**<br>) **(Weapons of Mass Destruction** |
| **RI JONG NAM,** | ) **Proliferators Sanctions Regulations)** |
| **JO UN HUI,** | ) **31 C.F.R. 510.201 and 510.206**<br>) **(North Korea Sanctions Regulations)** |
| **O SONG HUI,** | ) |
| **RI MYONG JIN,** | ) **18 U.S.C. § 1344**<br>) **(Bank Fraud)** |
| **RI JONG WON,** | ) |
| **JONG SUK HUI,** | ) **18 U.S.C. § 1956(h)**<br>) **(Conspiracy to Launder Monetary** |
| **KIM TONG CHOL,** | ) **Instruments)** |
| **KIM CHIN a/k/a KIM JIN,** | ) **18 U.S.C. § 1956(a)(2)(A)**<br>) **(International Money Laundering)** |
| **HUANG HAILIN,** | ) |
| **HUANG YUEQING,** | ) **18 U.S.C. § 1956(h)**<br>) **(Continuing Financial Crimes Enterprise)** |
| **JIN YONGHE,** | ) |
| **SUN WEI,** | ) **FORFEITURE:** |
| **RI CHUN HWAN,** | ) **18 U.S.C. § 982(a)(1)**<br>) **18 U.S.C. § 982(a)(2)(A)** |
| **KIM HUI SUK,** | ) **18 U.S.C. § 981(a)(1)(A)**<br>) **18 U.S.C. § 981(a)(1)(C)** |
| **HAN YONG CHOL,** | ) **21 U.S.C. § 853(p)**<br>) **28 U.S.C. § 2461(c)** |

|  | ) |
| --- | --- |
| **RI CHUN SONG,** | ) |
| | ) |
| **RI JONG CHOL,** | ) |
| | ) |
| **KIM KWANG CHOL,** | ) |
| | ) |
| **RI YONG SU,** | ) |
| | ) |
| **KU JA HYONG,** | ) |
| | ) |
| **JIN YONGHUAN,** | ) |
| | ) |
| **KWON SONG IL,** | ) |
| | ) |
| **RYU MYONG IL,** | ) |
| | ) |
| **HYON YONG IL,** | ) |
| | ) |
| **HWANG WON JUN,** | ) |
| | ) |
| **HAN KI SONG,** | ) |
| | ) |
| **HAN JANG SU,** | ) |
| | ) |
| **RI MYONG HUN,** | ) |
| | ) |
| **KIM KYONG NAM,** | ) |
| | ) |
| **and KIM HYOK JU,** | ) |
| | ) |
| **Defendants.** | ) |

## INDICTMENT

The Grand Jury charges that:

At times material to this Indictment:

## Introduction

1.      The charges alleged in this Indictment arise from a multi-year scheme to covertly

access the U.S. financial system in spite of sanctions which are intended to deal with unusual and

extraordinary threats to the national security, foreign policy, and economy of the United States.

2.      The conduct alleged in this Indictment began outside of the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and was therefore within the venue of the United States District Court for the District of Columbia, as provided by Title 18, United States Code, Sections 3237(a) and 3238.

3.      FOREIGN TRADE BANK OF THE DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA ("FTB"), headquartered in Pyongyang, Democratic People's Republic of Korea North Korea ("North Korea"), was North Korea's primary foreign exchange bank.  FTB was a wholly state-owned institution that represented the government of North Korea in international, inter-bank communications.  FTB maintained correspondent relationships with different financial institutions in many countries, and has offices in several regions of the world.  FTB had more than 600 employees in its head office located in Pyongyang, and approximately 300 employees worked in its branches and subsidiaries.  FTB performed functions for the North Korean government including, but not limited to, facilitating credit loans, making investments, regulating the use of foreign currency, setting the exchange rate for the North Korean Won, negotiating with foreign banks, facilitating foreign banking for North Koreans, buying and selling foreign currency, and facilitating the export and import of various commodities.

4.      On March 11, 2013, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") added FTB to the Specially Designated Nationals and Blocked Persons ("SDN")  list as part of the United States' efforts to impede North Korea's ballistic missile and weapons of mass destruction programs, pursuant to Presidential Executive Order 13382.  OFAC noted in its designation that North Korea used FTB to facilitate transactions on behalf of actors linked to North Korea's proliferation network.

5.      KO CHOL MAN, KIM SONG UI, HAN UNG, RI JONG NAM, JO UN HUI, O

SONG HUI, RI MYONG JIN, RI JONG WON, JONG SUK HUI, KIM TONG CHOL, KIM CHIN

a/k/a KIM JIN, HUANG HAILIN, HUANG YUEQING, JIN YONGHE, SUN WEI, RI CHUN

HWAN, KIM HUI SUK, HAN YONG CHOL, RI CHUN SONG, RI JONG CHOL, KIM

KWANG CHOL, RI YONG SU, KU JA HYONG, JIN YONGHUAN, KWON SONG IL, RYU

MYONG IL, HYON YONG IL, HWANG WON JUN, HAN KI SONG, HAN JANG SU, RI

MYONG HUN, KIM KYONG NAM, and KIM HYOK JU worked in various capacities to provide

services and effect prohibited U.S. dollar transactions for FTB.

6.      KO CHOL MAN and KIM SONG UI were North Korean citizens who respectively

acted at various times as the President of FTB.  HAN UNG and RI JONG NAM were North Korean

citizens and acted at various times as the co-Vice Presidents of FTB. In these roles, these

defendants oversaw the operations of FTB's primary headquarter branch in North Korea ("FTB

Headquarters").  On September 26, 2017, OFAC designated KO CHOL MAN for being an official

of the government of North Korea.

7.      JO UN HUI, O SONG HUI, RI MYONG JIN, RI JONG WON, and JONG SUK

HUI were North Korean citizens who were agents of FTB Headquarters.

8.      KIM TONG CHOL and KIM CHIN a/k/a KIM JIN were North Korea citizens who

operated FTB's covert branch in Shenyang, China.  HUANG HAILIN, HUANG YUEQING, JIN

YONGHE, and SUN WEI were Chinese citizens who operated FTB's covert branch in Shenyang,

China.  KIM TONG CHOL, HUANG HAILIN and HUANG YUEQING managed FTB front

companies Sumer International Group Ltd ("Sumer") and Headsoon Trading ("Headsoon").

Defendants KIM TONG CHOL and KIM CHIN a/k/a KIM JIN managed FTB front company

Shenyang Bright Century.  KIM TONG CHOL, JIN YONGHE, and SUN WEI managed FTB front

4

company Mingzheng International Trading Ltd (Mingzheng).  On September 26, 2017, OFAC designated KIM TONG CHOL for being an official for the government of North Korea.  OFAC noted his role as a FTB representative in Shenyang, China.  On June 29, 2017, OFAC designated SUN WEI for acting on behalf of FTB.  OFAC noted his work involved establishing and running a front company on behalf of FTB.  On August 22, 2017, OFAC designated Mingzheng for having provided material support to, and acting on behalf of, FTB.

     9.    RI CHUN HWAN and KIM HUI SUK were North Korean citizens who operated FTB's covert branch in Zhuhai, China.  On September 26, 2017, OFAC designated RI CHUN HWAN for being an official for the government of North Korea.  OFAC noted his role as a FTB representative in Zhuhai, China.

     10.    HAN YONG CHOL and RI CHUN SONG were North Korean citizens who operated FTB's covert branch in Beijing, China.  On September 26, 2017, OFAC designated RI CHUN SONG for being an official for the government of North Korea.  OFAC noted his role as a FTB representative in Beijing, China.

     11.    RI JONG CHOL was a North Korean citizen who operated FTB's covert branch in Austria.  KIM KWANG CHOL and RI YONG SU, who were North Korean citizens, and RI JONG CHOL managed the Korea Ungum Corporation.  On August 3, 2018, OFAC designated the Korea Ungum Corporation for having provided material support to, and acting on behalf of, FTB.

     12.    KU JA HYONG was a North Korean citizen who operated FTB's covert branch in Libya.  On September 26, 2017, OFAC designated KU JA HYONG for being an official for the government of North Korea.  OFAC noted his role as a FTB representative in Libya.  JIN YONGHUAN was a Chinese citizen who operated FTB's covert branch in Libya.  KU JA HYONG

and JIN YONGHUAN managed FTB front companies Liaoning Yuzheng and Hong Kong Yuzheng.

13.     KWON SONG IL and RYU MYONG IL were North Korean citizens who operated FTB's covert branch in Kuwait.

14.     HYON YONG IL, HWANG WON JUN, and HAN KI SONG were North Korean citizens who operated FTB's covert branch in Thailand.  HAN KI SONG also served as a member of the U.S.- and UN-designated Reconnaissance General Bureau, which is North Korea's primary intelligence bureau.

15.     HAN JANG SU was a North Korean citizen who operated FTB's covert branch in Moscow, Russia.  On March 31, 2017, OFAC designated HAN JAN SU for having provided material support to, and acting on behalf of, FTB.  OFAC noted his role as a FTB representative in Moscow, Russia.

16.     RI MYONG HUN and KIM KYONG NAM were North Korean citizens who operated FTB's covert branch in Khabarovsk, Russia.

17.     KIM HYOK JU was a North Korean citizen who operated FTB's covert branch in Vladivostok, Russia.

<u>International Emergency Economic Powers Act</u>

18.     The International Emergency Economic Powers Act ("IEEPA"), enacted in 1977, authorizes the President to impose economic sanctions in response to an unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national

security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

19.     The Departments of the Treasury, Commerce, and State enforce and administer economic sanctions under their respective authorities, to accomplish U.S. foreign policy and national security goals.  In particular, the Department of the Treasury publishes a publicly available list of individuals and entities ("Specially Designated Nationals and Blocked Persons" or "SDNs") targeted by U.S. economic sanctions.  SDNs' property and interests in property, subject to U.S. jurisdiction or in the possession and control of U.S. persons, are blocked when they are placed on the SDN list.  U.S. persons, including U.S. financial institutions, are generally prohibited from dealing with SDNs and their property and interests in property.

20.     Using the powers conferred by IEEPA, the President and the Executive Branch have issued orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities suspected of proliferating Weapons of Mass Destruction ("WMD").  On November 14, 1994, the President issued Executive Order 12938, finding "that the proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

21.     On June 28, 2005, the President, to take additional steps with respect to the national emergency described and declared in Executive Order 12938, issued Executive Order 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") to target proliferators of WMD and their support networks and to deny designated proliferators access to the U.S. financial and commercial systems.  Executive Order 13382 authorized the

United States Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Order. Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." See 31 C.F.R. § 544.101 *et seq.* Executive Order 13382 and the Weapons of Mass Destruction Proliferators Sanctions Regulations prohibit transactions or dealings by any U.S. person or within the United States with individuals and entities placed on the SDN list, unless exempt or authorized by OFAC.

22. On March 15, 2016, the President, to take additional steps with respect to the previously described national emergency, issued Executive Order 13722 to address the Government of North Korea's continuing pursuit of its nuclear and missile programs. Pursuant to that authority, on March 16, 2016, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations." See 31 C.F.R. § 510.101 *et seq.* Executive Order 13722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC.

23. Executive Orders 13382 and 13722, the Weapons of Mass Destruction Proliferators Sanctions Regulations, and North Korea Sanctions Regulations also prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in these regulations.

24. Executive Orders 13382 and 13722, the Weapons of Mass Destruction Proliferators Sanctions Regulations, and North Korea Sanctions Regulations also prohibit any transaction by any U.S. person or within the United States that evades or avoids, or has the purpose of evading or avoiding, any prohibition set forth in these regulations.

8

25.     Foreign financial institutions regularly maintain accounts in the United States at banks that process U.S. dollar transactions ("Correspondent Banks").  Correspondent Banks accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution.  See 31 C.F.R. § 1010.605.  Correspondent Banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars.  It is through these accounts that the funds used in U.S. dollar transactions clear.   SDNs are, among other things, prohibited from accessing Correspondent Banks in the United States through foreign financial institutions, either directly or indirectly.

26.     The Export Administration Regulations contain a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals, and other types of legal persons – that are subject to specific license requirements for the export, reexport and/or transfer (in-country) of specified items.  These persons comprise the U.S. Department of Commerce's Entity List, which is found at Title 15 Code of Federal Regulations, Part 744, Supplement No. 4.  The Department of Commerce first published the Entity List in February 1997 as part of its efforts to inform the public of entities who have engaged in activities that could result in an increased risk of the diversion of exported, reexported and transferred (in-country) items to WMD programs.  Since its initial publication, grounds for inclusion on the Entity List have expanded to include activities sanctioned by the U.S. State Department and activities contrary to U.S. national security and/or foreign policy interests.  On an

individual basis, the persons on the Entity List are subject to export licensing requirements and policies supplemental to those found elsewhere in the Export Administration Regulations.

Bank Secrecy Act and the USA PATRIOT Act

27.    According to the U.S. Department of the Treasury ("Treasury"), the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act as well as sanctions programs administered by OFAC.  The Financial Crimes Enforcement Network ("FinCEN") was responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system from illicit use.

28.    The Bank Secrecy Act required U.S. financial institutions to take anti-money laundering measures for foreign financial institutions engaged in correspondent banking of U.S. dollar transactions.

29.    The Bank Secrecy Act broadly defined foreign financial institutions to include dealers of foreign exchange and money transmitters in a manner not merely incidental to their business. See 31 C.F.R. § 1010.605(f).

30.    Section 311 of the USA PATRIOT Act, codified at Title 31, United States Code, Section 5318A as part of the Bank Secrecy Act, gave FinCEN a range of options, called "special measures," that could be adapted to target specific money laundering and terrorist financing concerns.  A Section 311 finding and the related special measure were implemented through various orders and regulations incorporated into Title 31, Code of Federal Regulations, Chapter X.  In order to protect the integrity of the U.S. financial system, a special measure imposed under Section 311 prevented financial institutions from causing U.S. financial institutions from engaging

10

in any type of financial transaction with an entity within the jurisdiction deemed an area of money laundering concern.

31.     In May 2016, FinCEN made a Section 311 finding against North Korea. Specifically, FinCEN's finding deemed the entire North Korean financial sector as a jurisdiction of primary money laundering concern.  See Federal Register, Vol. 81, No. 107 (June 3, 2016).

32.     In November 2016, FinCEN implemented the most severe special measure against the entire North Korean financial sector.  See Federal Register, Vol. 81, No. 217 (November 9, 2016); 31 CFR § 1010.659.  The "special measure" barred U.S. financial institutions from maintaining a correspondent account for any North Korean financial institution or any party acting on its behalf.  The "special measure" also required covered financial institutions to take reasonable steps to not process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involved a North Korean financial institution.  Because of the finding that the entire North Korea financial sector was a primary money laundering concern, FinCEN cut all North Korean financial institutions—and entities acting on their behalf—off from any trade in U.S. dollar transactions via correspondent banking.

33.     FinCEN noted that North Korea makes "extensive use of deceptive financial practices, including the use of shell and front companies to obfuscate the true originator, beneficiary, and purpose behind its transactions," in part "to evade international sanctions."  See Federal Register, Vol. 81, No. 217 at 78716, 78718.  North Korean entities have attempted to circumvent the Section 311(a) ban by using foreign front companies to engage in financial transactions on their behalf.

34.     Correspondent banks in the United States that fail to comply with the Section 311 finding, are subject to criminal liability pursuant to Title 31, United States Code, Section 5322.

11

## COUNT ONE
## THE CONSPIRACY

35.     From on or about March 11, 2013, through the Present, within the District of Columbia and elsewhere, defendants KO CHOL MAN, KIM SONG UI, HAN UNG, RI JONG NAM, JO UN HUI, O SONG HUI, RI MYONG JIN, RI JONG WON, JONG SUK HUI, KIM TONG CHOL, KIM CHIN a/k/a KIM JIN, HUANG HAILIN, HUANG YUEQING, JIN YONGHE, SUN WEI, RI CHUN HWAN, KIM HUI SUK, HAN YONG CHOL, RI CHUN SONG, RI JONG CHOL, KIM KWANG CHOL, RI YONG SU, KU JA HYONG, JIN YONGHUAN, KWON SONG IL, RYU MYONG IL, HYON YONG IL, HWANG WON JUN, HAN KI SONG, HAN JANG SU, RI MYONG HUN, KIM KYONG NAM, and KIM HYOK JU did knowingly combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to:

a.      commit offenses against the United States, that is, the export of financial services from the United States to a SDN in North Korea without having first obtained the required license from OFAC, located in the District of Columbia, in violation of Title 50, United States Code, Sections 1702 and 1705, the Weapons of Mass Destruction Proliferators Sanctions Regulations, pursuant to Title 31, Code of Federal Regulations, Section 544.201, *et seq.*, and North Korea Sanctions Regulations, pursuant to Title 31, Code of Federal Regulations, Section 510.201, *et seq.*;

b.      defraud the U.S. Government by interfering with and obstructing a lawful government function, that is, the enforcement of: the Weapons of Mass Destruction Proliferators Sanctions Regulations; the North Korea Sanctions Regulations; and the of laws and regulations prohibiting the supply of financial services from the United States to

a SDN in North Korea without authorization or a license, by deceit, craft, trickery, and dishonest means;

   c.  defraud the United States government by interfering with and obstructing a lawful government function, that is, supervision by the Federal Reserve Board and the Office of Comptroller of Currency, which are located in the District of Columbia, of banks implementation of required anti-money laundering and sanctions programs;

   d.  commit offenses against the United States, that is, by knowingly executing a scheme: to defraud a financial institution; and to obtain moneys and funds owned and under the custody and control of, a financial institution, by means of false and fraudulent pretenses, representations, and promises, that is by concealing from U.S. financial institutions that they were engaged in financial transactions with a North Korean financial institution, which was in a jurisdiction deemed an area of money laundering concern, in violation of Title 18, United States Code, Section 1344(1) and (2).

## Objects of the Conspiracy

36. The objects of the conspiracy were:

   a. to enrich the defendants and other co-conspirators;

   b. to transact in U.S. dollars by North Korean entities otherwise barred from accessing the U.S. financial system;

   c. to facilitate the  purchase of products and services for North Korean end users; and

   d. to evade relevant regulations, prohibitions on export of financial service, and licensing requirements.

**Manner and Means of the Conspiracy**

37.     The manner and means by which defendants and their co-conspirators sought to accomplish the objects of the conspiracy, included, among others, the following:

a.     the defendants and other co-conspirators communicated with co-conspirators inside and outside of North Korea;

b.     FTB policy dictated sending the defendants and other co-conspirators abroad "in close cooperation with different financial institutions of other countries to study fast developing financial technologies and experiences of other countries."

c.     the defendants and other co-conspirators opened and operated covert branches of FTB outside of North Korea, including in Thailand, Libya, Austria, Russia, Kuwait, and China, which the defendants used to engage in otherwise prohibited U.S. dollar transactions.

d.     the defendants and other co-conspirators took up residence in foreign countries to operate these covert branches, from which they opened and operated front companies and worked with established third-party financial facilitators to procure commodities and facilitate payments in U.S. dollars on behalf of parties in North Korea;

e.     the defendants and other co-conspirators concealed FTB's involvement in U.S. dollar payments from Correspondent Banks in order to trick the banks into processing payments that the banks otherwise would not have done;

f.     the defendants and other co-conspirators concealment tactics included:

i.  establishing and using over 250 front companies to process U.S. dollar payments;

ii.  repeatedly creating new front companies after the government or banks detected prior front companies' association with North Korea;

14

iii. listing false end destinations and customers on documents such as contracts and invoices; and

iv. engaging in coded conversations.

g.     the defendants and other co-conspirators caused Correspondent Banks to process at least $2.5 billion in illegal payments via over 250 front companies, which payments transited through the United States during the period of the conspiracy.

**Overt Acts**

38.     In furtherance of this conspiracy, and to accomplish its purposes and objects, at least one of the co-conspirators committed or caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

**a.     FTB Headquarters**

i. On or about March 13, 2013, JO UN HUI corresponded with agents of several FTB foreign covert branches, including KIM TONG CHOL of FTB Shenyang, KU JA HYONG of FTB Libya, HYON YONG IL of FTB Thailand, KIM KYONG NAM and RI MYONG HUN of FTB Khabarovsk, and RI JONG CHOL of FTB Austria.

ii. On or about July 19, 2013, a co-conspirator at FTB Headquarters made a coded request for 2nd and 4th quarter balance information from HYON YONG IL of FTB Thailand, RI JONG CHOL of FTB Austria, KU JA HYONG of Libya, RYU MYONG IL of FTB Kuwait, and KIM KYONG NAM and RI MYONG HUN of FTB Khabarovsk.

iii. On or about February 28, 2014, JO UN HUI made a coded request to HYON YONG IL of FTB Thailand, KU JA HYONG of FTB Libya, HAN JANG

SU of FTB Moscow, KIM KYONG NAM and RI MYONG HUN of FTB Khabarovsk, and RYU MYONG IL of FTB Kuwait, to send currency balance information for 2014 to FTB Headquarters.

iv.  On or about June 10, 2015, a co-conspirator at FTB Headquarters corresponded with agents of several FTB foreign covert branches, including KIM TONG CHOL of FTB Shenyang, RI CHUN SONG of FTB Beijing, KU JA HYONG of FTB Libya, RYU MYONG IL of FTB Kuwait, HYON YONG IL of FTB Thailand, KIM KYONG NAM and RI MYONG HUN of FTB Khabarovsk, RI JONG CHOL of FTB Austria, RI CHUN HWAN and KIM HUI SUK of FTB Zhuhai, HAN JANG SU of FTB Moscow, and a Dandong representative of Korea Kwangson Bank, a sanctioned North Korean bank subordinate to FTB.

v.  On or about April 25, 2017, a co-conspirator at FTB headquarters corresponded with agents of several FTB foreign covert branches, including KIM TONG CHOL of FTB Shenyang, RI JONG CHOL of FTB Austria, RI CHUN SONG of FTB Beijing, KU JA HYONG of FTB Libya, HWANG WON JUN of FTB Thailand, RI CHUN HWAN of FTB Zhuhai, and HAN JANG SU of FTB Moscow.

vi.  On or about May 29, 2017, RI MYONG JIN corresponded with agents of several FTB foreign covert branches, including KIM TONG CHOL of FTB Shenyang, RI CHUN SONG of FTB Beijing, KU JA HYONG of FTB Libya, HWANG WON JUN of FTB Thailand, RI CHUN HWAN of FTB Zhuhai, RI MYONG HUN of FTB Khabarovsk, and HAN JANG SU of

16

FTB Moscow.

vii.   On or about June 12, 2018, KO CHOL MAN, HAN UNG, and RI JONG NAM caused a FTB front company to pay a U.S. Company approximately $90,000.00 on behalf of the North Korean government.

viii.   On or about March 20, 2019, KO CHOL MAN, HAN UNG, and RI JONG NAM caused a FTB front company to pay a U.S. Company approximately $195,000.00 on behalf of the North Korean government.

ix.   On or about December 24, 2019, KO CHOL MAN, HAN UNG, and RI JONG NAM caused a foreign company to pay a U.S. Company approximately $10,000.00.

x.   On or about January 3, 2020, KO CHOL MAN, HAN UNG, and RI JONG NAM caused a foreign company to pay a U.S. Company approximately $20,000.00.

xi.   On or about January 10, 2020, KO CHOL MAN, HAN UNG, and RI JONG NAM caused a foreign company to pay a U.S. Company approximately $20,000.00.

**b.   FTB Shenyang**

i.   On or about June 19, 2013, SUN WEI opened a bank account at Chinese Bank 1.

ii.   On or about August 6, 2013, FTB Headquarters sent KIM TONG CHOL coded instructions to pay a Shenyang foreign trade company ("Shenyang Company") $46,000.00 at its Chinese bank and included a coded reference number.

iii. On or about August 7, 2013, KIM TONG CHOL caused Sumer, a FTB Shenyang front company established by HUANG HAILIN, to wire a payment of $45,930.00 to Shenyang Company's Chinese bank account, which payment cleared through a U.S. correspondent bank.

iv. On or about August 21, 2013, KIM TONG CHOL directed HUANG YUEQING to amend a U.S. dollar payment instruction which contained a coded payment reference.

v. On or about October 7, 2013, HAN JANG SU of FTB Moscow provided KIM TONG CHOL with passport information for KIM SONG UI and JONG SUK HUI of FTB HQ.

vi. On or about November 11, 2013, KO CHOL MAN of FTB HQ sent a copy of his passport to KIM CHIN.

vii. On or about December 3, 2013, KIM TONG CHOL directed JONG SUK HUI of FTB HQ to make a $30,000.00 payment using Shenyang Bright Century, a FTB Shenyang front company.

viii. On or about December 17, 2013, KIM TONG CHOL corresponded with HUANG HAILIN about a transaction fee related to Sumer, a FTB Shenyang front company.

ix. On or about February 20, 2014, KIM TONG CHOL provided FTB Headquarters the name of a FTB front company based out of the Marshall Islands, International Silver-Bridge Commercial Group, and its Chinese bank account.

x. On or about April 2, 2014, FTB Headquarters sent KIM TONG CHOL

18

coded instruction to pay $25,000.00 to a Chinese electronics company at its Chinese bank account, and a related coded payment reference.

xi.   On or about April 3, 2014, KIM TONG CHOL caused International Silver-Bridge Commercial Group to wire payment of $24,910.00 to a Chinese electronics company's Chinese bank account, which payment cleared through a U.S. correspondent bank.

xii.   On or about June 3, 2014, HUANG HAILIN discussed with KIM TONG CHOL a due diligence inquiry from Chinese Bank 1 about Sumer, a FTB Shenyang front company, and its wire payments to Panda International Information—a Chinese company that the U.S. Commerce Department added to the Entity List in June 2014 for activities contrary to the national security of the United States—and Dandong Kehua Economic and Trade Co—a Chinese company which OFAC later sanctioned.

xiii.   On or about June 3, 2014, KIM TONG CHOL directed HUANG HAILIN to falsely state to the Chinese Bank 1 that Sumer, a FTB Shenyang front company, wired payments to Panda International Information and Dandong Kehua Economic and Trade Co. for legitimate telecommunication equipment purchases.

xiv.   On or about July 8, 2014, HUANG YUEQING provided KIM TONG CHOL with a due diligence inquiry that a U.S. correspondent bank provided to Chinese Bank 1 in which HUANG YUEQING falsely told Chinese Bank 1 that Sumer, a FTB Shenyang front company, did not have any relationship with North Korea.

19

xv. On or about July 8, 2014, KIM TONG CHOL provided HUANG YUEQING with additional false statements for HUANG YUEQING to provide in regards to remaining questions on the due diligence inquiry from the U.S. correspondent bank.

xvi. On or about July 11, 2014, KIM TONG CHOL directed HUANG YUEQING to contact Chinese Bank 2 to ask why a payment of $19,950 from Sumer's account at Chinese Bank 2 to a Chinese electronics company's account at Chinese Bank 3 had not yet been processed.

xvii. On or about July 18, 2104, SUN WEI made a recorded phone call to Chinese Bank 4 to inquire about opening an account and what the fees would be for international wire payments.

xviii. On or about August 1, 2014, SUN WEI opened a bank account at Chinese Bank 4.

xix. On or about August 15, 2014, KIM TONG CHOL and HUANG YUEQING caused Sumer's account at Chinese Bank 2 to wire $19,930.00 to a Chinese electronics company's account at Chinese Bank 3, which payment the U.S. correspondent bank blocked, and which wire included a coded FTB payment reference.

xx. On or about September 29, 2014, KIM TONG CHOL provided JIN YONGHE FTB's official stamp.

xxi. On or about November 18, 2014, HUANG HAILIN sent KIM TONG CHOL payment confirmation of $400,000.00 from Headsoon, a FTB Zhuhai front company established by HUANG HAILIN, to Sumer.

20

xxii.   On or about February 25, 2015, SUN WEI received a Mingzheng contract with a Chinese company, which listed SUN WEI as the CEO of Mingzheng on the signature page.

xxiii.   On or about March 11, 2015, KIM CHIN sent KIM TONG CHOL U.S. dollar payment instructions to a Chinese electronics company.

xxiv.   On or about March 20, 2015, KIM CHIN sent Mingzheng's U.S. dollar bank account information at Chinese Bank 4 to RI CHUN HWAN and KIM HUI SUK of FTB Zhuhai.

xxv.   On or about March 20, 2015, RI CHUN HWAN and KIM HUI SUK of FTB Zhuhai caused China Unitech, a FTB Zhuhai front company, to wire $100,000.00 to Mingzheng's bank account at Chinese Bank 4, which payment cleared through a U.S. correspondent bank.

xxvi.   On or about March 24, 2015, KIM CHIN confirmed to RI CHUN HWAN and KIM HUI SUK of FTB Zhuhai that FTB Shenyang had taken a loan of $100,000.00 from FTB Zhuhai.

xxvii.   On or about June 12, 2015, JIN YONGHE directed KIM TONG CHOL to pay $23,470.00 to a co-conspirator company.

xxviii.   On or about June 12, 2015, KIM TONG CHOL and JIN YONGHE caused Mingzheng to wire $23,470.00 to a co-conspirator company, which payment cleared through a U.S. correspondent bank.

xxix.   On or about November 2, 2015, KIM TONG CHOL caused Mingzheng to wire $174,982.00 to a Chinese company's Chinese bank account, which payment the U.S. correspondent bank blocked.

xxx.   On or about November 5, 2015, KIM TONG CHOL caused Mingzheng to wire $295,769.21 to Chinese company 2's Chinese bank account, which payment the U.S. correspondent bank blocked.

xxxi.   On or about November 11, 2015, KIM TONG CHOL and Chinese Telecommunications Company 1 employee received a contract receipt from Chinese Company 2 about the November 5, 2015 blocked payment, which contract reflected the shipment of electronic goods to North Korea.

xxxii.   On or about November 12, 2015, KIM TONG CHOL and a Chinese Telecommunications Company 1 employee received a contract receipt from Chinese Company 2 about the November 5, 2015 blocked payment, which contract falsely changed the destination of the shipment of electronic goods from North Korea to Hong Kong.

xxxiii.   On or about November 18, 2015, JIN YONGHE sent KIM TONG CHOL a notice from Chinese Bank 4 notifying Mingzheng that a U.S. correspondent bank blocked a payment of $24,932.00 as part of OFAC sanction compliance.

xxxiv.   On or about November 18, 2015, JIN YONGHE sent KIM TONG CHOL a notice from Chinese Bank 4 notifying Mingzheng that a U.S. correspondent bank blocked a payment of $174,982.00, which noted that the transaction could not be processed due to the Weapons of Mass Destruction Proliferators Sanctions Regulations issued by OFAC.

xxxv.   On or about November 19, 2015, KIM TONG CHOL sent JIN YONGHE several documents including a copy of SUN WEI's Chinese national

identification card, an English translation of the identification card, invoices documenting payments from Mingzheng, the business registration certificate for Mingzheng , and Certificate of Incorporation for Mingzheng.

xxxvi.   On or about November 19, 2015, KIM TONG CHOL sent JIN YONGHE a copy of the wire transfer receipt for the $174,982.00, which had hand written notes underlining the North Korean weapons of mass destruction reference and the information about filing a license application with OFAC.

xxxvii.   On or about November 20, 2015, JIN YONGHE sent KIM TONG CHOL a copy of a notice from Chinese Bank 1 that a U.S. correspondent bank blocked a payment of $9,945.0 payment from a Chinese electronics company to Mingzheng because of OFAC's weapons of mass destruction proliferation sanctions program.

xxxviii.   On or about November 20, 2015, SUN WEI submitted a letter to OFAC in which he falsely stated that Mingzheng had not violated the North Korean weapons of mass destruction proliferators sanctions regulations issued by OFAC.

xxxix.   On or about November 20, 2015, SUN WEI submitted a license application to OFAC, which contained Mingzheng incorporation records and fabricated contracts and invoices signed by SUN WEI.

xl.   On or about December 7, 2015, JIN YONGHE sent KIM TONG CHOL information about OFAC blocking Mingzheng payments via a U.S. correspondent bank.

xli.   On or about January 12, 2016, a Swiss businessman told KIM TONG

CHOL to create falsified documents, including a signed agreement between Mingzheng and the Swiss company, to replace the original contract with a North Korean entity, in an attempt to have OFAC release $41,822.04 in blocked funds Mingzheng had attempted to send the Swiss businessman on or about November 15, 2015.

xlii.   On or about January 15, 2016, KIM TONG CHOL informed JO UN HUI of FTB Headquarters about three sets of U.S. dollar payments to front companies, each with a coded FTB payment reference.

xliii.   On or about January 15, 2016, KIM TONG CHOL further informed JO UN of FTB Headquarters HUI about the blocking of Mingzheng payments by OFAC.

xliv.   On or about January 15, 2016, KIM TONG CHOL also informed JO UN HUI of FTB Headquarters that KIM TONG CHOL was attempting to get fabricated documents relating to the Mingzheng blocked funds, which would be submitted to OFAC.

xlv.   On or about March 1, 2016, KIM TONG CHOL sent the documents to the Swiss businessman, including a fabricated Mingzheng contract backdated June 5, 2015, with the Swiss businessman's company, which falsely stated that the goods originated shipped from Hong Kong, when in fact they were coming from North Korea.

DANDONG KEHUA

xlvi.   On or about March 29, 2013, FTB Headquarters sent KIM TONG CHOL coded payment instructions to pay co-conspirator Dandong Kehua—a

Chinese company which OFAC later sanctioned—$8,670.00, which instructions reflected that such payment was for a 20% payment for a prior contract.

xlvii.   On or about April 1, 2013, KIM TONG CHOL at FTB Shenyang caused Mingzheng to wire a payment of $8,670.00 to Dandong Kehua's Chinese bank account, which payment cleared through a U.S. correspondent bank, and which payment included the same notation of a 20% payment for a prior contract and a coded FTB reference number.

xlviii.   On or about August 8, 2014, FTB Headquarters sent KIM TONG CHOL coded payment instructions to pay co-conspirator Dandong Kehua $59,319.00, which instructions included a coded FTB reference number.

xlix.   On or about April 20, 2013, co-conspirator Dandong Kehua renewed an annual contract with Chinese Telecommunications Company 2 for the sale of Chinese Telecommunications Company 2 handsets, and which contract contained a provision requiring compliance with U.S. export control laws and forbade shipment to embargoed countries.

l.   On or about August 13, 2014, KIM TONG CHOL at FTB Shenyang caused Mingzheng to wire a payment of $613,483.80 to Dandong Kehua's Chinese bank account, which payment cleared through a U.S. correspondent bank, and which payment included the same coded FTB reference number.

li.   On or about September 5, 2014, FTB Headquarters sent KIM TONG CHOL coded payment instructions to pay co-conspirator Dandong Kehua $250,871.60, which instructions included a coded FTB reference number.

lii.  On or about September 8, 2014, KIM TONG CHOL at FTB Shenyang caused International Silver-Bridge Commercial Group to wire a payment of $250,380.03 to Dandong Kehua's Chinese bank account, which payment cleared through a U.S. correspondent bank.

liii. On or about February 17, 2015, co-conspirator Dandong Kehua renewed an annual contract with Chinese Telecommunications Company 2 for the sale of Chinese Telecommunications Company 2 handsets, and which contract contained a provision requiring compliance with U.S. export control laws and forbade shipment to embargoed countries.

liv.  On or about August 26, 2015, FTB Headquarters sent KIM TONG CHOL coded payment instructions to pay co-conspirator Dandong Kehua $454,900.00, which payment instructions encoded Dandong Kehua's phone number and bank account, and the SWIFT code for the Bank of Dandong— a bank which the United States subsequently banned from U.S. dollar transactions based on North Korean money laundering.

PANDA INTERNATIONAL INFORMATION TECHNOLOGY

lv.   On or about August 21, 2014, FTB Headquarters sent KIM TONG CHOL coded instructions to pay Panda International Information Technology—a Chinese company that the Commerce Department added to the Entity List in June 2014 for activities contrary to the national security of the United States—$120,000.00 at Panda International Information Technology's

Chinese bank account, noted that the customer was the Korean Ministry of Post and Telecommunication, and a related coded payment reference.

lvi.   On or about August 22, 2014, KIM TONG CHOL caused Mingzheng to wire payment for $119,782.00 to Panda International Information Technology's Chinese bank account, which payment cleared through a U.S. correspondent bank, with a notation referencing the coded payment.

lvii.   On or about March 23, 2015, RI CHUN HWAN and KIM HUI SUK of FTB Zhuhai caused China Unitech, a FTB Zhuhai front company, to wire $200,000.00 to Panda International Information Technology's Chinese bank account, which payment cleared through a U.S. correspondent bank.

lviii.   On or about October 29, 2015, KIM TONG CHOL caused Mingzheng to wire $174,982.00 to Panda International Information Technology's Chinese bank account on behalf of Cheo Technology joint venture, which payment the U.S. correspondent bank blocked, and which wire included a coded FTB payment reference.

c.   **FTB Zhuhai**

i.   On or about September 5, 2013, KIM HUI SUK informed HUANG YUEQING of FTB Shenyang that KIM HUI SUK caused Headsoon, a FTB Zhuhai front company, to wire $498,000.00 to a Chinese company's bank account at Chinese Bank 1, which payment cleared through a U.S. correspondent bank.

ii.   On or about October 3, 2013, RI CHUN HWAN shared his new FTB Zhuhai contact information with KIM TONG CHOL, who forwarded that

information to FTB Headquarters.

iii.   On or about October 14, 2013, FTB Headquarters sent RI CHUN HWAN coded instructions to pay a Malaysian company $50,220.88 at its Malaysian bank account with a coded reference number and a contract number.

iv.   On or about October 15, 2013, RI CHUN HWAN caused Headsoon, a FTB Zhuhai front company, to wire $50,100.00 to the Malaysian company's bank account, which payment cleared through a U.S. correspondent bank.

v.   On or about January 6, 2014, FTB Headquarters sent FTB Zhuhai coded instructions to wire a Malaysian company $20,937.00 at its Malaysian bank account for a contract with a North Korean trading company with a coded reference number.

vi.   On or about January 7, 2014, KIM HUI SUK caused China Unitech, a FTB Zhuhai front company, to wire $20,875.00 to the Malaysian company's Malaysian bank account, which payment cleared through a U.S. correspondent bank.

vii.   On or about January 7, 2014, KIM HUI SUK caused FTB Zhuhai to send coded confirmation to FTB Headquarters that FTB Zhuhai paid $20,937.00, with the same coded FTB reference number.

viii.   On or about January 20, 2015, KIM HUI SUK caused China Unitech, a FTB Zhuhai front company, to wire $6,325.36 to Headsoon, a FTB Zhuhai front company, which payment cleared through a U.S. correspondent bank.

ix.   On or about March 20, 2015, RI CHUN HWAN caused FTB Zhuhai to arrange a $200,000.00 loan with a North Korean trade company.

28

x.   On or about March 31, 2015, KIM HUI SUK provided the name and Chinese bank account number of China Unitech, a FTB Zhuhai Front Company, to an agent of Korea Kwangson Bank, a sanctioned North Korean bank subordinate to FTB.

xi.   On or about December 23, 2018, RI MYONG JIN of FTB Headquarters communicated with RI CHUN HWAN.

xii.   On or about April 19, 2019, RI CHUN HWAN confirmed to RI MYONG JIN of FTB Headquarters in a coded communication that RI CHUN HWAN caused FTB Zhuhai to make a $1,060,000.00 payment.

**d.    FTB Beijing**

i.   On or about November 3, 2014, HAN YONG CHOL sent Korea Kwangson Bank, a sanctioned North Korean bank subordinate to FTB, coded instructions to make two payments totaling $500,000.00 to Dandong Kehua Economic and Trade Co—a Chinese company which OFAC later sanctioned.

ii.   On or about November 19, 2014, HAN YONG CHOL received the name and bank account of a front company associated with Korea Kwangson Bank, a sanctioned North Korean bank subordinate to FTB.

iii.   On or about June 23, 2015, RI CHUN SONG received coded instructions from Korea Kwangson Bank, a sanctioned North Korean bank subordinate to FTB, to make a $56,941.00 payment.

iv.   On or about June 23, 2015, RI CHUN SONG sent the coded $56,941.00 payment instructions from Korea Kwangson Bank, a sanctioned North

Korean bank subordinate to FTB, to HAN YONG CHOL.

v. On or about August 27, 2015, HAN YONG CHOL caused Hong Kong Vast International Trade Co., a FTB Beijing front company, to wire $248,085.00 to a Korea Kwangson Bank front company's Chinese bank account, which payment cleared through a U.S. correspondent bank.

vi. On or about December 9, 2015, HAN YONG CHOL received due diligence documents from a Chinese Bank 1, which documents referenced OFAC compliance.

vii. On or about December 15, 2015, HAN YONG CHOL received a ledger that a Chinese bank compiled of wire payments transacted in 2015 by Hong Kong Vast International Trade Co., a FTB Beijing front company, totaling approximately $13,988,940.27.

viii. On or about March 18, 2016, RI CHUN SONG contacted FTB Headquarters to share his new contact information.

ix. On or about March 23, 2016, FTB Headquarters sent RI CHUN SONG coded instructions to pay a Chinese company $768,974.70, with a coded FTB reference number.

x. On May 3, 2016, HAN YONG CHOL sent KIM KYONG NAM and RI MYONG HUN of FTB Khabarovsk a copy of HAN YONG CHOL'S passport.

xi. On or about May 24, 2016, RI CHUN SONG informed HAN YONG CHOL that a Chinese bank wanted FTB to send payment instructions in a letter on FTB letterhead, signed by KIM SONG UI, and be addressed to the Chinese

bank's financial institution department.

xii.   On or about November 22, 2016, RI CHUN SONG received coded instructions from FTB Headquarters to pay a U.S. Company $77,400.00 on behalf of the North Korean government with a coded reference number.

xiii.   On or about November 23, 2016, RI CHUN SONG caused Dalian Ouya, a FTB Beijing front company, to wire $77,400.00 to a U.S. Company, which payment cleared through a U.S. correspondent bank.

xiv.   On or about November 23, 2016, RI CHUN SONG sent FTB Headquarters a coded receipt for payment of $77,400.00 by Dalian Ouya, a FTB Beijing front company, to a U.S. Company.

xv.   On or about May 8, 2017, RI CHUN SONG sent HAN YONG CHOL payment confirmation that a FTB Beijing front company sent $385,000.00 to Velmur—a FTB Vladivostok front company, which OFAC later sanctioned—which payment cleared through a U.S. correspondent bank.

xvi.   On or about May 8, 2017, RI CHUN SONG sent HAN YONG CHOL payment confirmation that a FTB Beijing front company sent $407,000.00 to Velmur, which payment cleared through a U.S. correspondent bank.

xvii.   On or about June 27, 2017, RI CHUN SONG sent FTB Headquarters a coded receipt for payment of $150,000.00.

xviii.   On or about September 26, 2018, HAN YONG CHOL sent KU JA HYONG of FTB Libya identity documents for co-conspirators in Libya.

xix.   On or about February 17, 2019, HAN YONG CHOL warned RI CHUN SONG of FTB Beijing about anti-money laundering regulations being

implemented by banks.

xx. On or about May 28, 2019, HAN YONG CHOL described hardware failures in a component that can be used in ship, aviation, and rocket machinery.

**e.     FTB Austria**

i. On or about May 9, 2013, FTB Headquarters sent RI JONG CHOL coded payment instructions for payment of $44,455.08 on behalf of a North Korean entity.

ii. On or about March 14, 2014, RI JONG CHOL provided documentation to an Austrian bank, which stated that the Ungum Corporation was wholly owned by the North Korean government.

iii. On or about May 5, 2014, RI JONG CHOL informed HYON YONG IL that RI YONG SU was the Section Chief of the Ungum Corporation—an entity OFAC sanctioned in August 2018 as a FTB front company—who was responsible for Ungum's Austrian bank account.

iv. On or about October 23, 2014, RI JONG CHOL signed a power of attorney form in Austria on behalf of Ungum Corporation.

v. On or about February 28, 2018, RI JONG CHOL received coded payment instructions from KIM KWANG CHOL.

vi. On or about November 11, 2018, RI JONG CHOL informed KIM KWANG CHOL, the chairman of Ungum, about the shipment of coal and a related coded FTB U.S. dollar payment reference.

vii. On or about February 18, 2019, RI JONG CHOL informed KIM KWANG CHOL, the chairman of Ungum, about a coded FTB U.S. dollar payment

reference.

    viii.  On or about March 17, 2019, RI JONG CHOL informed KIM KWANG CHOL, the chairman of Ungum, about a coded FTB U.S. dollar payment reference.

**f.    FTB Libya**

    i.  On or about April 26, 2013, JIN YONGHUAN caused Hong Kong Yuzheng Industry Co., Limited to be incorporated in Hong Kong.

    ii.  On or about July 10, 2013, KIM TONG CHOL informed FTB Headquarters that he had signed a contract with Liaoning Yuzheng International Trading Co., Ltd. ("Liaoning Yuzheng") and that they would use an offshore company to move funds.

    iii.  On or about November 9, 2016, KU JA HYONG and JIN YONGHUAN caused Hong Kong Yuzheng, the offshore branch of Liaoning Yuzheng, to receive a payment of approximately $994,980.00 from Dandong Zhicheng Metallic Materials—a company which OFAC later sanctioned—which payment cleared through a U.S. correspondent bank.

    iv.  On or about October 18, 2016, KU JA HYONG caused JIN YONGHUAN to use Hong Kong Yuzheng, the offshore branch of Liaoning Yuzheng, to make a payment of approximately $101,206.00 to a U.S. Company, which payment cleared through a U.S. correspondent bank.

    v.  On or about November 9, 2016, KU JA HYONG and JIN YONGHUAN caused Hong Kong Yuzheng, the offshore branch of Liaoning Yuzheng, to receive a payment of approximately $100,000.00 from Ruizhi Resources—

33

a front company for Dandong Zhicheng Metallic Materials—which payment cleared through a U.S. correspondent bank.

vi.   On or about January 4, 2017, KU JA HYONG and JIN YONGHUAN caused Hong Kong Yuzheng, the offshore branch of Liaoning Yuzheng, to make a payment of approximately $499,436.00 to a Chinese oil company, which payment cleared through a U.S. correspondent bank.

vii.   On or about June 8, 2017, KU JA HYONG sent JIN YONGHUAN coded instructions to pay $77,400.00 to the U.S. Company, with a coded FTB reference number.

viii.   On or about June 8, 2017, KU JA HYONG sent JIN YONGHUAN coded instructions to pay $21,000.00 to a Chinese communication company, with a coded FTB reference number.

**g.   FTB Kuwait**

i.   On or about February 8, 2017, RYU MYONG IL provided KWON SONG IL a copy of RYU MYONG IL's Kuwaiti identity card.

ii.   On or about April 26, 2017, RYU MYONG IL corresponded with FTB Headquarters.

iii.   On or about May 15, 2017, RYU MYONG IL informed a co-conspirator about coded payment transactions.

iv.   On or about May 21, 2017, RYU MYONG IL informed FTB Headquarters about crediting U.S. dollar payments he received from North Koreans in Kuwait.

v.   On or about June 26, 2017, KWON SONG IL received coded instructions

34

from FTB Headquarters to pay $63,000.00 to a state fund for economic development.

vi. On or about August 29, 2017, RI MYONG JIN of FTB Headquarters sent RYU MYONG IL and KWON SONG IL coded instructions to pay $705,000.00 to a foreign telecommunications company, with a coded FTB reference number, on behalf of Cheo Technology joint venture.

vii. On or about September 11, 2017, RYU MYONG IL informed FTB Headquarters about crediting payments he received from North Koreans in Kuwait.

viii. On or about September 25, 2017, RYU MYONG IL confirmed in a coded message to RI MYONG JIN of FTB Headquarters that RYU MYONG IL paid $705,000.00 related to the foreign telecommunications company's invoice to Cheo Technology joint venture.

ix. On or about September 30, 2017, KWON SONG IL received an account statement from a Kuwaiti financial institution.

x. On or about October 27, 2017, KWON SONG IL received a request from a Kuwaiti financial institution to update his account information.

**h.   FTB Thailand**

i. On or about August 26, 2013, HYON YONG IL arranged for HAN UNG of FTB Headquarters and RYU MYONG IL of FTB Kuwait to travel via Air Koryo— an airline which OFAC later sanctioned—to Thailand.

ii. On or about July 11, 2014, HYON YONG IL received coded payment instructions from FTB Headquarters to pay $50,340.00 to a Thai electronics

company's Singaporean bank account for a contract with the North Korean government with a coded FTB reference number.

iii.  On or about July 15, 2014, HYON YONG IL caused the wiring of $30,340.00 to the Thai electronics company's Singapore bank account, which payment cleared through a U.S. correspondent bank.

iv.  On September 17, 2015, HYON YONG IL emailed FTB Headquarters a letter issued by FTB Headquarters that guaranteed payment to a Thai front company for a shipment of aluminum to a North Korean purchaser with a purchase price of $325,080.00, which if not paid to the Thailand front company within six months, FTB Headquarters would debit the North Korean buyer's account and repay the full purchase price directly to the Thailand front company.

v.  On or about December 28, 2015, HYON YONG IL communicated with FTB Beijing's HAN YONG CHOL about obtaining Thai residency for an incoming FTB Thailand agent, HWANG WON JUN, and provided a copy of HWANG WON JUN's North Korean passport, as well as his application for residency in Thailand.

vi.  On or about January 25, 2016, HYON YONG IL requested a Chinese company to issue an invoice in the name of Kisgum Co., LTD, a FTB Thailand front company.

vii.  On or about January 28, 2016, HYON YONG IL received a message about a banking problem due to OFAC and how they were working to solve this problem.

viii.  On or about May 2, 2016, HYON YONG IL received a spreadsheet detailing a profit–sharing plan between a business in Thailand and FTB, which included expenses related to travel to/from North Korea.

ix.  On or about April 21, 2017, JO UN HUI of FTB Headquarters sent HWANG WON JUN coded instructions to pay Thailand Front Company 1 $49,785.00 at its Thailand bank account, with a coded FTB reference number.

x.  On or about July 19, 2017, HWANG WON JUN caused Kisgum Co, LTD, a FTB Thailand front company, to pay approximately $45,839.12 to a company which Australia subsequently designated, which payment cleared through a U.S. correspondent bank.

xi.  On or about October 9, 2017, HWANG WON JUN received coded instructions to pay a communications company $50,250.00 at its Thai bank account with a coded FTB reference number.

xii.  On or about December 28, 2017, FTB Headquarters sent HWANG WON JUN coded instructions to pay a technology company $600,000.00 on behalf of a North Korean based electronics and communications company, with a coded FTB reference number.

xiii.  On or about December 29, 2017, HWANG WON JUN sent FTB Headquarters a coded confirmation of the $600,000.00 payment, with a coded FTB reference number.

xiv.  On or about September 3, 2018, HAN KI SONG sent an order to First Credit Bank, another sanctioned North Korean bank, to make a $25,000.00

payment.

xv.   On or about October 16, 2018, HAN KI SONG sent an order to First Credit Bank, another sanctioned North Korean bank, to make a $50,000.00 payment.

xvi.   On or about December 26, 2018, HAN KI SONG sent a copy of his North Korean passport to a Thai company.

xvii.   On or about March 13, 2019, HAN KI SONG sent an order to First Credit Bank, another sanctioned North Korean bank, to make a $40,000.00 payment.

xviii.   On or about May 23, 2019, RI MYONG JIN of FTB Headquarters sent HWANG WON JUN coded instructions to pay two Chinese companies, $303,329.83 and $1,000,000.00 respectively, both of which payments included a coded FTB reference number.

xix.   On or about June 12, 2019, RI MYONG JIN of FTB Headquarters sent HWANG WON JUN coded instructions to pay $49,850.00 to a Thai company and included a coded FTB reference number.

xx.   On or about June 13, 2019, RI MYONG JIN of FTB Headquarters sent HWANG WON JUN coded instructions to pay $50,250.00 to a Thai telecommunication company and included a coded FTB reference number.

xxi.   On or about June 14, 2019, RI MYONG JIN of FTB Headquarters sent HWANG WON JUN coded instructions to pay $100,000.00 to a Chinese technology company and included a coded FTB reference number.

xxii.   On or about June 14, 2019, HWANG WON JUN informed RI MYONG JIN

of FTB Headquarters that HWANG WON JUN had caused a payment of $49,850.00 and included a coded FTB reference number.

**i.    FTB Moscow**

    i.   On or about December 30, 2015, HAN JANG SU informed KO CHOL MAN and KIM TONG CHOL of FTB Headquarters that the FTB office in Moscow was operational.

    ii.  On or about July 30, 2016, HAN JANG SU sent HAN YONG CHOL of FTB Beijing a "Certificate of Appointment" document that identified HAN JANG SU as the Deputy General Manager of a Dandong-based Chinese trading company.

    iii. On or about June 28, 2017, HAN JANG SU received a request from a Russian bank for a letter from the North Korean government confirming RI JONG WON's status at FTB.

    iv. On or about October 4, 2017, HAN JANG SU received a contract and related documents, which detailed the sale of goods for $67,840.00 to be paid via a U.S. correspondent bank, and that shipments would transit through Dalian, China with an ultimate destination of North Korea.

    v.  On or about October 5, 2017, HAN JANG SU received a contract for the purchase of goods in U.S. dollars for the Korea Gyonghung General Trading Corporation in North Korea.

    vi. On or about October 18, 2017, HAN JANG SU sent a Russian bank a letter from FTB headquarters addressing problems with correspondent banking.

    vii. On or about January 10, 2018, KO CHOL MAN, HAN UNG, RI JONG

39

NAM, and O SONG HUI of FTB Headquarters caused HAN JANG SU to send a letter to a Russian bank confirming their status as members of the Board of Directors at FTB.

viii.   On or about January 29, 2018, HAN JANG SU provided a Russian bank with a signature card for FTB's account signed by:

   1.   KO CHOL MAN, listed as Chairman and President;

   2.   HAN UNG, listed as Vice President;

   3.   RI JONG NAM, listed as Vice President;

   4.   RI YONG SU;

   5.   JO UN HUI;

   6.   O SONG HUI, and

   7.   RI JONG WON.

ix.   On or about August 13, 2018, HAN JANG SU informed RI CHUN SONG that banks required corporate registration documents notarized by the North Korean embassy or Army commander in order to open a bank account for a foreign company.

x.   On or about January 10, 2019, HAN JANG SU received a due diligence document for a Russian bank, which reflected that KO CHOL MAN was the beneficial owner of FTB's bank account and the chairman of FTB, and that FTB was 100% owned by the government of North Korea.

xi.   On or about January 10, 2019, HAN JANG SU received an inquiry from a Russian bank about Ungum.

xii.   On or about January 10, 2019, HAN JANG SU received a due diligence

document for a Russian bank, which reflected that KIM KWANG CHOL
was the beneficial owner of Ungum's bank account and the chairman of
Ungum, and that Ungum was 100% owned by the government of North
Korea.

xiii.   On or about January 29, 2019, KO CHOL MAN, HAN UNG, RI JONG
NAM, and O SONG HUI of FTB Headquarters caused HAN JANG SU to
send a letter to a Russian bank confirming their status as members of the
Board of Directors at FTB.

**j.      FTB Khabarovsk**

i.   On or about May 21, 2013, RI MYONG HUN obtained accreditation
documents from the Central Bank of Russia, which identified RI MYONG
HUN as the head of the Representative Office of FTB in Khabarovsk.

ii.   On or about March 10, 2015, KIM TONG CHOL sent RI MYONG HUN
information about Shenyang Bright Century Trade Limited Co., a FTB
Shenyang front company.

iii.   On or about August 27, 2015, RI MYONG HUN completed a signature card
of FTB Khabarovsk's bank account at a Russian bank.

iv.   On or about September 22, 2015, KIM SONG UI, identified as president of
FTB, signed a power of attorney authorizing KIM KYONG NAM,
identified as deputy head of FTB's representative office in Khabarovsk, to
act on behalf of FTB with Russian banks and government entities, establish
correspondent banking relationships, provide assistance to FTB clients,
make deposits of FTB funds.

v.   On or about October 4, 2015, KIM SONG UI, identified as president of FTB, certified that FTB Headquarters previously appointed KIM KYONG NAM as the deputy head of FTB's representative office in Khabarovsk.

vi.   On or about October 4, 2015, KIM SONG UI, identified as president of FTB, certified that FTB Headquarters previously appointed RI MYONG HUN as the head of FTB's representative office in Khabarovsk.

vii.   On or about November 1, 2015, KIM KYONG NAM submitted due diligence records to a Russian bank which identified KIM KYONG NAM as an employee of the official representative office of FTB in Khabarovsk.

viii.   On or about November 1, 2015, RI MYONG HUN submitted due diligence records to a Russian bank which identified RI MYONG HUN as an employee of the official representative office of FTB in Khabarovsk.

ix.   On or about December 27, 2015, KIM KYONG NAM corresponded with HYON YONG IL of FTB Thailand.

x.   On or about January 27, 2019, RI MYONG JIN and JO UN HUI of FTB Headquarters received a message from HAN JANG SU of FTB Moscow.

**k.   FTB Vladivostok**

xi.   On or about April 17, 2017, HAN YONG CHOL of FTB Beijing sent a co-conspirator bank account information for Velmur—a FTB Vladivostok front company, which OFAC later sanctioned.

xii.   On or about June 12, 2017, KIM HYOK JU caused a co-conspirator in Russia to receive bank account information for Velmur, a FTB Vladivostok front company.

xiii.   On or about the following dates, KIM HYOK JU caused the following wires to Velmur, which payments cleared through a U.S. correspondent bank:

| Date | Wire Amount | Wire To |
|---|---|---|
| May 5, 2017 | $1,199,975.00 | Velmur |
| May 9, 2017 | $1,099,975.00 | Velmur |
| May 10, 2017 | $999,975.00 | Velmur |
| May 12, 2017 | $1,200,000.00 | Velmur |
| May 12, 2017 | $1,510,000.00 | Velmur |
| May 24, 2017 | $500,000.00 | Velmur |
| June 1, 2017 | $490,000.00 | Velmur |

xiv.   On or about November 7, 2017, KIM HYOK JU provided a co-conspirator in Russia with a copy of the U.S. Department of Justice's forfeiture complaint against FTB-front company Velmur.

(**Conspiracy to Commit Offenses and Defraud the United States**, in violation of Title 18, United States Code, Section 371)

## COUNT TWO
(**Violation of the International Emergency Economic Powers Act**)

39.     The allegations set forth in Paragraphs 1 through 34 and 37 through 38 are incorporated and re-alleged by reference in this Count.

40.     On or about March 20, 2015, KO CHOL MAN, RI CHUN HWAN, KIM HUI SUK, KIM TONG CHOL, HUANG HAILIN, HUANG YUEQING, KIM CHIN a/k/a KIM JIN, JIN YONGHE, and SUN WEI did willfully violate and attempt to violate the International Emergency Economic Powers Act, by effecting payment of $100,000.00 from China Unitech, a FTB Zhuhai front company, to Mingzheng, a FTB Shenyang front company, which transited through the United States financial system, on behalf of the Democratic People's Republic of Korea, without a license or authorization obtained from the U.S. Department of the Treasury's Office of Foreign Assets Control located in the District of Columbia.

43

(**Unlawful Provision of Financial Services to a SDN in North Korea**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Part 544)

## COUNT THREE
### (**Violation of the International Emergency Economic Powers Act**)

41.     The allegations set forth in Paragraphs 1 through 34 and 37 through 38 are incorporated and re-alleged by reference in this Count.

42.     On or about May 8, 2017, KIM SONG UI, HAN UNG, RI CHUN SONG, HAN YONG CHOL, HAN JANG SU, RI MYONG HUN, KIM KYONG NAM. and KIM HYOK JU did willfully violate and attempt to violate the International Emergency Economic Powers Act, by effecting payment of $407,000.00 from a FTB Beijing front company to Velmur, a FTB Vladivostok front company, which transited through the United States financial system, on behalf of the Democratic People's Republic of Korea, without a license or authorization obtained from the U.S. Department of the Treasury's Office of Foreign Assets Control located in the District of Columbia.

(**Unlawful Provision of Financial Services to a SDN in North Korea**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 544 and 510)

**COUNTS FOUR – SEVEN**
**(Bank Fraud)**

43.　　The allegations set forth in Paragraphs 1 through 34 and 37 through 38 are incorporated and re-alleged by reference in this Count.

44.　　On or about the dates in the below chart by, within the District of Columbia and elsewhere, the respective defendants attempted to execute a scheme and artifice to defraud, and to obtain monies, funds, credits, assets, securities, and other property owned by, and under the custody and control of a U.S. correspondent bank, which was a financial institution with deposits insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations, and promises:

| COUNT | DATE | DEFENDANTS | TRANSACTION | AMOUNT |
|---|---|---|---|---|
| 4 | March 20 2015 | KO CHOL MAN, RI CHUN HWAN, KIM HUI SUK, KIM TONG CHOL, HUANG HAILIN, HUANG YUEQING, KIM CHIN a/k/a KIM JIN, JIN YONGHE, and SUN WEI | China Unitech, a FTB Zhuhai front company, to Mingzheng | $100,000.00 |
| 5 | Nov. 9, 2016 | KU JA HYONG and JIN YONGHUAN | Ruizhi Resources to Liaoning Yuzheng, a FTB Libya front company | $100,000.00 |
| 6 | May 8, 2017 | KIM SONG UI, HAN UNG, RI CHUN SONG, HAN YONG CHOL, HAN JANG SU, RI MYONG HUN, KIM KYONG NAM. and KIM HYOK JU | FTB Beijing front company to Velmur, a FTB Vladivostok front company | $407,000.00 |
| 7 | July 19, 2017 | JO UN HUI and HWANG WONG JUN | Kisgum Co, LTD, a FTB Thailand front company, to a company which Australia subsequently designated | $45,839.12 |

(**Bank Fraud**, in violation of Title 18, United States Code, Sections 1344(1) and 1344(2)).

## COUNT EIGHT
### (Conspiracy to Launder Money)

45.    The allegations set forth in Paragraphs 1 through 34 and 37 through 38 are incorporated and re-alleged by reference in this Count.

46.    Beginning in or around March 2013, and continuing up to and including in or about June 2017, within the District of Columbia and elsewhere, the defendants, KO CHOL MAN, KIM SONG UI, HAN UNG, RI JONG NAM, JO UN HUI, O SONG HUI, RI MYONG JIN, RI JONG WON, JONG SUK HUI, KIM TONG CHOL, KIM CHIN a/k/a KIM JIN, HUANG HAILIN, HUANG YUEQING, JIN YONGHE, SUN WEI, RI CHUN HWAN, KIM HUI SUK, HAN YONG CHOL, RI CHUN SONG, RI JONG CHOL, KIM KWANG CHOL, RI YONG SU, KU JA HYONG, JIN YONGHUAN, KWON SONG IL, RYU MYONG IL, HYON YONG IL, HWANG WON JUN, HAN KI SONG, HAN JANG SU, RI MYONG HUN, KIM KYONG NAM, KIM HYOK JU, and co-conspirators known and unknown to the Grand Jury, conspired with each other and with others known and unknown to the Grand Jury to knowingly violate Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, and transferring, or attempting to transport, transmit, and transfer monetary instruments and funds from places outside of the United States to and through a place inside the United States, and from a place in the United States to or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, violations of: section 1344 (relating to financial institution fraud); and the penalty provision of IEEPA.

### The Object of the Conspiracy

47.    The objects of the conspiracy were:

    a.    to illegally enrich the coconspirators;

    b.    to illegally access the U.S. financial system; and

46

c.       to promote the provision of financial services for a Specially Designated National without the necessary OFAC licenses.

(**Conspiracy to Launder Money** in Violation of Title 18, United States Code, Section 1956(h))

## COUNTS NINE – TWELVE
### (International Money Laundering)

48.       The allegations set forth in Paragraphs 1 through 34 and 37 through 38 are incorporated and re-alleged by reference in this Count.

49.       On or about the dates in the below chart by, within the District of Columbia and elsewhere, the respective defendants transported, transmitted, and transferred, and attempted to transport, transmit, and monetary instruments and funds from places outside of the United States to and through a place inside the United States, and from a place in the United States to or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, violations of: section 1344 (relating to financial institution fraud); and the penalty provision of IEEPA.

| COUNT | DATE | DEFENDANTS | TRANSACTION | AMOUNT |
|---|---|---|---|---|
| 9 | March 20 2015 | KO CHOL MAN, RI CHUN HWAN, KIM HUI SUK, KIM TONG CHOL, HUANG HAILIN, HUANG YUEQING, KIM CHIN a/k/a KIM JIN, JIN YONGHE, and SUN WEI | China Unitech, a FTB Zhuhai front company, to Mingzheng | $100,000.00 |
| 10 | Nov. 9, 2016 | KU JA HYONG and JIN YONGHUAN | Ruizhi Resources to Liaoning Yuzheng, a FTB Libya front company | $100,000.00 |
| 11 | May 8, 2017 | KIM SONG UI, HAN UNG, RI CHUN SONG, HAN YONG CHOL, HAN JANG SU, RI MYONG HUN, KIM KYONG NAM. and KIM HYOK JU | FTB Beijing front company to Velmur, a FTB Vladivostok front company | $407,000.00 |

| 12 | July 19, 2017 | JO UN HUI and HWANG WONG JUN | Kisgum Co, LTD, a FTB Thailand front company, to a company which Australia subsequently designated | $45,839.12 |

(**International Money Laundering**, in violation of Title 18, United States Code, Sections 1956(a)(2)(A), and 1956(h)).

## COUNT THIRTEEN
### (Continuing Financial Crimes Enterprise)

50.     The allegations set forth in Paragraphs 1 through 34 and 37 through 38 are incorporated and re-alleged by reference in this Count.

51.     From in or about or about March 2013 to in or about December 2015 and on or about January 2018 to the Present, within the District of Columbia and elsewhere, KO CHOL MAN organized, managed, and supervised a continuing financial crimes enterprise, and received $5,000,000 or more in gross receipts from such enterprise during any 24-month period.

(**Continuing Financial Crimes Enterprise**, in violation of Title 18, United States Code, Sections 225).

## COUNT FOURTEEN
### (Continuing Financial Crimes Enterprise)

52.     The allegations set forth in Paragraphs 1 through 34 and 37 through 38 are incorporated and re-alleged by reference in this Count.

53.     From in or about or about January 2016 to in or about December 2017, within the District of Columbia and elsewhere, KIM SONG UI organized, managed, and supervised a continuing financial crimes enterprise, and received $5,000,000 or more in gross receipts from such enterprise during any 24-month period.

(**Continuing Financial Crimes Enterprise**, in violation of Title 18, United States Code, Sections 225).

## FORFEITURE ALLEGATION

1.      Upon conviction of any of the offenses alleged in Counts One through Three of this Indictment, defendants shall forfeit to the United States: (a) any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes, or is derived from, proceeds traceable to these offenses.  The United States will also seek a forfeiture money judgment against the defendants for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from, proceeds traceable to a violation of these offenses.  The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to these offenses.

2.      Upon conviction of the offense alleged in County Four through Seven of this Indictment, defendants shall forfeit to the United States any property constituting, or derived from, proceeds the defendant obtained, directly or indirectly, as the result of this violation, pursuant to Title 18, United States Code, Section 982(a)(2)(A). The United States will also seek a forfeiture money judgment against this defendant equal to the value of any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of this violation.

3.      Upon conviction of the offense alleged in Counts Eight through Twelve of this Indictment, defendants shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).  The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, involved in this offense, and any property traceable to such property.

4.      The specific property subject to forfeiture includes $63,511,387.85 frozen and seized by the U.S. government between October 19, 2015 and January 9, 2020.

5.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property that cannot be subdivided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture**, in violation of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1), and 982(a)(2)(A); Title 28, United States Code, Section 2461(c); and Title 21, United States Code, Section 853(p)).

A TRUE BILL

_____
FOREPERSON

*Timothy J. Shea / KK*

Attorney of the United States in
  and for the District of Columbia